OPINION OF THE COURT
Kenneth L. Gartner, J.
A published news article recently reported that an investiga *10 tion into possible money laundering being conducted through the racetracks operated by the defendant New York Racing Association was prompted by a small-time money laundering case in which a Queens bank robber used stolen money to purchase betting vouchers and then exchanged the vouchers for clean cash. (Newsday, Sept. 28, 2000, at A33, col 1.) The instant case does not involve any such question of wrongdoing, but does raise a novel legal issue regarding the negotiability of those same vouchers when their possession is obtained by a thief or finder. The defendant concedes that “there are no cases on point.”
The defendant is a private stock corporation incorporated and organized in New York as a nonprofit racing association pursuant to section 202 of the Racing, Pari-Mutuel Wagering and Breeding Law. The defendant owns and operates New York’s largest thoroughbred racetracks — Belmont Park Racetrack, Aqueduct Racetrack, and Saratoga Racetrack — where it stages thoroughbred horse races and conducts pari-mutuel wagering on them pursuant to a franchise granted to the defendant by the State of New York.
The plaintiff was a Belmont Park Racetrack horse player. He attended the track and purchased from the defendant a voucher for use in SAMS machines. As explained in Seminole Tribe v State (1993 WL 475999, *9 [SD Fla, Sept. 22, 1993, Marcus, J.]): “In addition to accepting bets placed at parimutuel facility windows staffed by facility employees, [some] facilities use SAMS. SAMS are automated machines which permit a bettor to enter his bet by inserting money, vouchers or credit cards into the machine, thereby enabling him to select the number or combination he wishes to purchase. A ticket is issued showing those numbers.”
When a voucher is utilized for the purpose of placing a bet at a SAMS machine, the SAMS machine, after deducting the amount bet by the horse player during the particular transaction, provides the horse player with, in addition to his betting ticket(s), a new voucher showing the remaining balance left on the voucher.
In the instant case, the unfortunate horse player departed the SAMS machine with his betting tickets, but without his new voucher — showing thousands of dollars in remaining value — which he inadvertently left sitting in the SAMS machine. Within several minutes he realized his mistake and hurried back to the SAMS machine, only to find the voucher gone. He immediately notified a security guard. The defendant’s person *11 nel thereafter quickly confirmed the plaintiff as the original purchaser of the lost voucher. The defendant placed a computerized “stop” on the voucher. However, whoever had happened upon the voucher in the SAMS machine and taken it had acted even more quickly: the voucher had been brought to a nearby track window and “cashed out” within a minute or so of the plaintiff having mistakenly left it in the SAMS machine.
The plaintiff now sues the defendant, contending that the defendant should be liable for having failed to “provide any minimal protection to its customers” in checking the identity and ownership of vouchers prior to permitting their “cash out.” The defendant, in response, contends that the voucher consists of “bearer paper,” negotiable by anyone having possession, and that it is under no obligation to purchasers of vouchers to provide any such identity or ownership checks.
As opposed to instruments such as ordinary checks, which are typically made payable to the order of a specific person and are therefore known as “order paper,” bearer paper is payable to the “bearer,” i.e., whoever walks in carrying (or “bearing”) the instrument. Pursuant to section 3-111 of the Uniform Commercial Code, “[a]n instrument is payable to bearer when by its terms it is payable to * * * (c) ‘cash’ or the order of ‘cash’, or any other indication which does not purport to designate a specific payee.”
Each New York Racing Association voucher is labeled “Cash Voucher.” Each voucher contains the legend “Bet Against the Value or Exchange for Cash.” Each voucher is also encoded with certain computer symbols which are readable by SAMS machines. The vouchers do by their terms constitute “bearer paper.”
There is no doubt that under the Model Uniform Commercial Code the defendant would be a “holder in due course” of the voucher, deemed to have taken it free from all defenses that could be raised by the plaintiff. As observed in 2 White and Summers, Uniform Commercial Code (at 225-226, 152-153 [4th ed 1995]):
“Consider theft of bearer instruments * * * [T]he thief can make his or her transferee a holder simply by transfer to one who gives value in good faith. If the thief s transferee cashes the check and so gives value in good faith and without notice of any defense, that transferee will be a holder in due course under 3-302, free of all claims to the instrument on the part * * * of any person and free of all personal defenses of any prior party. Therefore, the holder in due course will not be li *12 able in conversion to the true owner * * * Of course, the owner of the check will have a good cause of action against the thief, but no other cause of action * * *
“If an instrument is payable to bearer * * * the possessor of the instrument will be a holder and, if he meets the other tests, a holder in due course. This is so even though the instrument may have passed through the hands of a thief; the holder in due course is one of the few purchasers in Anglo-Saxon jurisprudence who may derive a good title from a chain of title that includes a thief in its links.”
However, the Model Uniform Commercial Code in its present form is not in effect in New York. In 1990, the National Conference of Commissioners on Uniform State Laws and the American Law Institute approved a revised article 3. (Model Uniform Commercial Code art 3.) This revised article 3 has never been enacted in New York. Comment 1 to section 3-201 of the Model Uniform Commercial Code, commenting on the difference between it and its predecessor (which is still in effect in New York), states: “A person can become holder of an instrument * * * as the result of an event that occurs after issuance. ‘Negotiation’ is the term used in Article 3 to describe this post-issuance event * * * In defining ‘negotiation’ former Section 3-202(1) used the word ‘transfer,’ an undefined term, and ‘delivery,’ defined in Section 1-201(14) to mean voluntary change of possession. Instead, subsections (a) and (b) [now] use the term ‘transfer of possession’ and, subsection (a) states that negotiation can occur by an involuntary transfer of possession. For example, if an instrument is payable to bearer and it is stolen by Thief or is found by Finder, Thief or Finder becomes the holder of the instrument when possession is obtained. In this case there is an involuntary transfer of possession that results in negotiation to Thief or Finder.”
Thus, it would initially appear that under the prior Model Uniform Commercial Code, still in effect in New York, a thief or finder of bearer paper, as the recipient of an involuntary transfer, could not become a “holder,” and thus could not pass holder-in-due-course status, or good title, to someone in the position of the defendant.
This conclusion, however, is not without doubt. For instance, in 2 Anderson, Uniform Commercial Code § 3-202:35 (2d ed 1971), it was observed that: “The Code states that bearer paper is negotiated by ‘delivery.’ This is likely to mislead for one is not inclined to think of the acquisition of paper by a finder or a thief as a ‘voluntary transfer of possession.’ ” By stating that *13 the Code’s terminology was “misleading,” the treatise appears to imply that despite the literal import of the words, the contrary was true — negotiation could be accomplished by involuntary transfer, i.e., loss or theft.
In Adamar of N. J. v. Chase Lincoln First Bank (201 AD2d 174 [4th Dept 1994]), the Appellate Division determined that the Tropicana Casino in New Jersey became a holder in due course of signed cashier’s checks with blank payee designations which a thief had stolen from the defendant and negotiated to the casino for value after filling in the payee designation with his brother-in-law’s name. The Appellate Division, assuming without discussion that the thief was a “holder” of the stolen instruments and therefore able to transfer good title, held the defendant obligated to make payment on the stolen checks. (Accord, Walcott v Manufacturers Hanover Trust, 133 Misc 2d 725 [Civ Ct, Kings County 1986] [check-cashing service which unknowingly took for value from an intervening thief the plaintiffs check, which the plaintiff had endorsed in blank and thus converted to a bearer instrument, was a holder in due course of the check, having received good title from the thief].)
Presumably, these results have occurred because the courts in New York have implicitly interpreted the undefined term “transfer” as utilized in UCC 3-202 (1) as including the involuntary transfer of possession, so that as a practical matter the old Code (as still in effect in New York) has the same meaning as the new Model Uniform Commercial Code, which represents a clarification rather than a change in the law.
This result makes sense. A contrary result would require extensive verification procedures to be undertaken by all transferees of bearer paper. The problem with imposing an identity or ownership check requirement on the negotiation of bearer paper is that such a requirement would impede the free negotiability which is the essence of bearer paper. As held in Tonelli v Chase Manhattan Bank (41 NY2d 667, 671-672 [1977]): “[Where] the instrument entrusted to a dishonest messenger or agent was freely negotiable bearer paper * * * the drawee bank [cannot] be held liable for making payment to one presenting a negotiable instrument in bearer form who may properly be presumed to be a holder [citations omitted].” (See also, Bunge Corp. v Manufacturers Hanover Trust Co., 31 NY2d 223 [1972].) In Bunge Corp., the dishonest employee of the remitter of an official bank check delivered the check to the named payee but then (with the assistance of a confederate in *14 the payee’s employ) stole it back and. returned it to the bank, which cancelled it and gave the remitter a credit. The Court of Appeals determined that while an action could presumably be maintained by the payee against the remitter, equitable estoppel would bar the payee from pursuing a claim against the bank. The Court held that upon the check’s return by the remitter the bank had no obligation to the named payee to make any inquiry of the named payee before cancelling the check. In a dissent, Judge Breitel objected that freeing the bank of the obligation to make some inquiry of the specific person to whose order the check was made would obliterate the “distinction between order paper and bearer paper.” (31 NY2d, at 236.) Implicit in Judge Breitel’s objection (as well as the majority’s holding) is that in the case of bearer paper there certainly would be no obligation on the issuing bank to make any investigation before accepting its return, and giving value for it. (See also, Heinike Assocs. v Liberty Natl. Bank, 166 AD2d 922 [4th Dept 1990] [drawee bank was a holder in due course and thus not liable to drawer for permitting drawer’s faithless employee to cash bearer instruments].)
Moreover, the plaintiff in the instant case knew that the voucher could be “Exchange [d] for cash.” The plaintiff conceded at trial that (1) when he himself utilized the voucher prior to its loss, no identity or ownership check was ever made, and (2) he nevertheless continued to use it. The plaintiff could therefore not contend that he had any expectation that the defendant had in place any safeguards against the voucher’s unencumbered use, or that he had taken any actions in reliance on the same.
This court is compelled to render judgment denying the plaintiff’s claim, and in favor of the defendant.